ESTATE OF ERNEST E. KIRKPATRICK, DECEASED, L. R. FRENCH, JR. and RITA BETTIS, EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Kirkpatrick v. Commissioner
Docket No. 1976-73.
United States Tax Court
T.C. Memo 1975-344; 1975 Tax Ct. Memo LEXIS 30; 34 T.C.M. (CCH) 1490; T.C.M. (RIA) 750344; November 25, 1975, Filed Brooks L. Harman, for the petitioners. John W. Dierker, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency of $117,286.40 in petitioner's estate tax. A concession having been made by petitioner, the two remaining issues presented for our decision concern the respective fair market values of closely-held stock owned by Ernest E. Kirkpatrick in French Tool & Supply Company, Inc., and French Oil Company on April 17, 1968, the date of his death. FINDINGS OF FACT Some *31 of the facts have been stipulated and are so found. Ernest E. Kirkpatrick (decedent) died April 17, 1968, and L. R. French, Jr., and Rita Bettis qualified as executors of his estate. The executors' address was the American Bank of Commerce Building, Odessa, Texas, at the time the petition herein was filed. The executors timely filed a Federal estate tax return with the District Director of Internal Revenue, Dallas, Texas. On the date of his death, decedent owned 1,091 shares of stock in French Tool & Supply Company, Inc. (French Tool), which represented 43.43 percent of that company's 2,512 issued and outstanding shares. Rita Bettis, decedent's daughter, owned 545.5 shares (21.71 percent) and Lloyd French, Jr., Bettis' son, owned the remaining 875.5 shares (34.85 percent). French Tool is a Texas corporation, chartered in 1947. From 1947 until 1954 the company operated an International truck dealership and an oilfield supply house. In 1950, it entered the oil business. In 1954, it ceased its oilfield supply operations but continued to operate the International truck dealership. The company began a ranching business in 1955 and, in 1956, started a Chrysler-Plymouth dealership.
*32 On April 17, 1968, the date of decedent's death, French Tool operated an International truck dealership (and a related rig-up shop), a Chrysler-Plymouth dealership, and was engaged in the oil production and ranching business. The company sold products and services to the public in all phases of its business. The company's oil business consisted of certain producing and nonproducing properties situated primarily in the Permian Basin area of West Texas and Southeastern New Mexico. Its ranching operations consisted of a 50-percent, undivided ownership in two cattle and sheep ranches, the South Fork Ranch and Rancho Real, located, respectively, in Kerr County and Real County, Texas. A comparative balance sheet statement of French Tool for fiscal years ending June 30, 1966 through 1968 is as follows: 1968
1967
1966
Current assets
$1,332,050
$1,534,638
$1,719,645
Investment in capital stock
1,000
1,000
1,000
Fixed assets
Auto and truck operations
460,050
517,230
500,010
Oil operations
492,474
316,835
477,100
Ranch operations
1,235,694
1,250,719
1,315,579
Other assets
526,022
403,550
464,237
Total assets
$4,047,290
$4,023,972
$4,477,571
Current liabilities
$1,249,084
$1,302,107
$1,542,813
Long-term debt
1,194,456
1,273,759
1,498,580
Deferred taxes and other liabilities
65,404
55,125
40,650
Total liabilities
2,508,944
2,630,991
3,082,043
Capital stock
300,000
300,000
300,000
Earned surplus
1,303,971
1,158,606
1,161,153
1,603,971
1,458,606
1,461,153
Less: Treasury stock, at cost
65,625
65,625
65,625
Total net worth
1,538,346
1,392,981
1,395,528
Total liabilities and net worth
$4,047,290
$4,023,972
$4,477,571
Distributions: Total assets: Truck and auto operation
$2,049,391
$2,121,192
$2,318,885
Oil operations
492,474
316,835
477,100
Ranch operations
1,505,425
1,585,945
1,681,586
$4,047,290
$4,023,972
$4,477,571
Book value or net worth: Truck and auto operations
$ 632,390
$ 867,194
$1,025,608
Oil operations
492,474
109,490
(57,271)
Ranch operations
413,482
416,297
427,191
$1,538,346
$1,392,981
$1,395,528
Ratio of current assets to current liabilities
1 to.94
1 to.85
1 to.90
*33 A comparative statement of income and earned surplus of French Tool for the same fiscal years as follows: 1968
1967
1966
Amount
Percent
Amount
Percent
Amount
Percent
Trucks and Auto Operations
Net Sales
$5,337,710
100.00
$4,440,235
100.00
$5,565,745
100.00
Cost of sales
4,535,082
84.96
3,772,080
84.95
4,730,814
85.00
Gross profit on sales
802,628
15.04
668,155
15.05
834,931
15.00
Operating expense
658,968
12.35
662,703
14.92
729,768
13.11
143,660
2.69
5,452
.13
105,163
1.89
Other income
35,109
.66
29,097
.66
40,119
.72
178,769
3.35
34,549
.79
145,282
2.61
Other expense
60,435
1.13
(54,833)
(1.23)
(48,056)
(.86)
Income (loss) from truck and auto operations
118,334
2.22
(20,284)
(.44)
97,226
1.75
Oil Operations
Oil and gas revenues
265,513
308,932
321,422
Operating expense, depreciation, depletion,
dry holes, etc.
142,054
202,722
267,173
Operating income (loss) from oil operations
123,459
106,210
54,249
Ranch Operations
Revenues
118,141
69,102
83,947
Expenses
194,508
137,831
164,972
Operating income (loss) from ranch
(76,367)
(68,729)
(81,025)
Total income before taxes
165,426
17,197
70,450
Federal Income Taxes
Current
(9,782)
5,269
Deferred
(10,279)
14,475
825
Net income (loss) after taxes
145,365
(2,547)
69,625
Earned surplus beginning of year
1,158,606
1,161,153
1,091,528
Earned surplus, end of year
$1,303,971
$1,158,606
$1,161,153
*34 L. R. French, Jr. (French) had been the company's president and chief executive officer since February 1952. The three directors of French Tool at decedent's death were decedent, French, and Ralph Hamilton. Decedent also served as the company vice president, and Hamilton served as the secretary, treasurer, and general manager of the Automotive Division. On the date of his death, decedent also owned 130 shares of stock in French Oil Company (French Oil), which represented 6.5 percent of that company's 2,000 issued and outstanding shares. French owned 1,805 shares (90.25 percent), and the remaining 65 shares (3.25 percent) were owned by Bettis. French Oil is a Texas corporation, which was incorporated in 1935 as Rodman Supply Company (Rodman) to conduct an oil-field supply business in the Permian Basin area of West Texas and Southeastern New Mexico. In September 1954, French and decedent purchased 87 percent and 13 percent, respectively, of Rodman's outstanding stock. In the year of the purchase, Rodman operated an oilfield supply business in the Permian Basin, an oil and gas development and production business, and a ranching business. From 1954 until the date of decedent's *35 death, French served as the president and chief executive officer of French Oil. In 1963, Rodman sold the oilfield supply store assets and the name of the corporation was changed to French Oil Company. The new company, French Oil, retained certain accounts receivable, most of which had been charged off as bad debts. In the four succeeding years, it collected from those receivables the following amounts: 1964
$319,413.50
1965
103,676.00
1966
41,867.00
1967
154,447.00
After the sale of the oilfield supply store assets, the company continued in the oil, gas and ranching business and dealt some in the sale of tubular goods. During fiscal years ending August 31, 1965 through 1967, French Oil sold some of its oil and gas leases at an aggregate profit of $220,000 net after applicable taxes. At the start of its 1967-1968 fiscal year, the company owned 22 producing leases in the Permian Basin area. All 22 producing leases continued to produce throughout the fiscal year except the so-called University 30 lease, which was sold on May 31, 1968--about six weeks after the date of decedent's death. University 30 had been the company's most productive lease and, for *36 the nine-month period ending May 31, 1968, it produced approximately 66 percent of the total gross revenues from all 22 leases for that period. The idea to sell the University 30 lease came up after April 17, 1968, and a prospective purchaser of decedent's 6.5 shares of French Oil stock on that date would not have known that the University 30 lease would be sold six weeks later. On the date of decedent's death, French Oil produced and sold oil in the Permian Basin area, owned a 50-percent, undivided interest in the South Fork Ranch and Rancho Real, [1] and sold oilfield tubular goods. A comparative balance sheet statement of French Oil for fiscal years ending August 31, 1965 through 1967 is as follows: August 31,
1967
1966
1965
Current assets
$ 574,677
$ 619,507
$ 255,372
Fixed assets lOil operations
246,961
335,509
387,830
Ranch operations
1,346,401
1,402,750
1,397,080
Other
85,338
67,621
98,934
Other assets
727,063
498,108
706,105
Total assets
$2,980,440
$2,923,495
$2,845,321
Current liabilities
$ 404,885
$ 588,312
$ 600,997
Long-term debt
1,145,947
1,170,316
1,206,969
Total liabilities
1,550,832
1,758,628
1,807,966
Capital stock
200,000
200,000
200,000
Capital in excess of par
3,796
3,796
3,796
Earned surplus
1,225,812
961,071
833,559
Total net worth
1,429,608
1,164,867
1,037,355
Total liabilities and net worth
$2,980,440
$2,923,495
$2,845,321
Distribution: Assets
Oil operations
$ 693,800
$ 547,052
$ 737,460
Ranch operations
1,671,141
1,799,728
1,752,766
Other
615,499
576,715
355,095
Total assets
$2,980,440
$2,923,495
$2,845,321
Book value or net worth
Oil operations
$ 371,994
$ 90,246
$ 303,154
Ranch operations
500,825
537,532
463,952
Other
556,789
537,089
270,249
Total
$1,429,608
$1,164,867
$1,037,355
Ratio of current assets to current liabilities
1 to.70
1 to.95
.42 to 1
*37 A comparative statement of income and earned surplus for the same period is as follows: Year ended August 31,
1967
1966
1965
Amount
Percent
Amount
Percent
Amount
Percent
Oil and gas operations
Oil and gas sales
$408,773
100
$592,757
100
$458,675
100
Lease operating expense
89,880
116,080
121,375
Intangible development cost and dry hole cost
24,281
224,794
284,232
Depreciation and depletion
50,380
83,994
89,452
General and administrative
37,958
42,364
46,245
202,499
49
467,232
79
541,304
118
Income (loss) of oil and gas operations
206,274
51
125,525
21
(82,629)
(18)
Ranch Operations
Ranch income
91,152
100
83,512
100
74,893
100
Ranch operating expenses and depreciation
181,661
199
187,853
224
126,799
169
Income (loss) on ranch operations
(90,509)
(99)
(104,341)
(124)
(51,906)
(69)
Other
Sales - oil equipment
295,167
100
207,849
100
292,950
100
Expenses
146,190
50
157,796
76
187,820
64
Income (loss) on other operations
148,977
50
50,053
24
105,130
36
Federal income taxes
Refunds, reductions and other changes
56,274
32,327
Net income or loss after taxes
264,742
127,511
2,922
Earned surplus beginning of year
961,070
833,559
830,637
Earned surplus end of year
$1,225,812
$961,070
$833,559
*38 Neither French Oil nor French Tool had ever paid any dividends. There had never been any outside sale of their stock, [2] nor had their stock been listed on any public exchanges. On its return, petitioner valued decedent's 1,091 shares of French Tool stock at $353.63 per share. Respondent, in his deficiency notice, determined the fair market value of decedent's French tool stock to be its book value, or $600.34 per share. At trial, however, petitioner claimed the stock was worth $216 per share and respondent contended the stock to be worth no more than $500 per share. On the return, petitioner valued decedent's 130 shares of French Oil stock at $287.36 per share. In his deficiency notice, respondent again valued the stock at its book value, or $882.73 per share. At trial, however, petitioner claimed the stock to be worth $171 per share and respondent argued that the stock was properly valued at $650 per share. On the date of decedent's death, French *39 Tool and French Oil each owned a 50-percent undivided interest in two cattle and sheep ranches; the South Fork Ranch and Rancho Real. [3]
The Ranch is situated in an area of Texas known as "The Hill Country." This area is characterized by high, rolling hills and an unusually abundant amount of surface water. These factors, combined with a relatively mild summer climate, make the area extremely popular for recreational purposes. The Ranch contains a number of improvements such as frame dwellings, barns, storage sheds, etc. It has a good water supply with the wells and waterings spaced at about one for each of the 32 or 33 pastures. The major portion of the Ranch (approximately 28,165 acres) was purchased by *40 French in July 1963, for $70 per acre. In January 1965, French purchased approximately 3,065 additional acres for $75 per acre, and in March 1966, he bought the remaining 1,684 acres $75for per acre. [5]
On November 13, 1968, approximately seven months after the date of decedent's death, a pipeline company, Lo-Vaca Gathering Company, acquired by condemnation a pipeline right-of-way easement through a portion of the Ranch. In a subsequent condemnation suit, heard November 3, 1969, a jury composed of six residents of Kerr County returned a verdict in the County Court of Kerr County, Texas, that the fair market value of the Ranch, as of the date of condemnation, was $150 per acre. At these proceedings, R. Floyd Price, Jr. (petitioner's expert witness in the instant case), testified that, in his opinion, the Ranch was worth $125 per acre on November 13, 1968. As ultimate findings of fact, we find that: 1. The fair market value of the Ranch on April 17, 1968, was $94 per acre; 2. The fair market *41 value of decedent's 1,091 shares of French Tool stock was $300 per share on April 17, 1968; 3. The fair market value of decedent's 130 shares of French Oil stock was $250 per share on April 17, 1968. OPINION For purposes of determining the value of decedent's gross estate under section 2031, [6] we must find the respective fair market values of the shares of stock decedent owned in French Tool and French Oil on the date of his death. Determining the fair market value of closely-held stock is often a difficult task, and the instant case presents no exception. Among the factors courts have found relevant in making this determination are: (1) the value of the corporation's underlying assets; (2) the fact that less than a controlling interest is involved; (3) trends in the corporation's earnings; (4) the dividend paying capacity of the corporation; (5) the capitalized value of the corporation's past earnings; and (6) the corporation's management. Richard R. Riss, Sr.,56 T.C. 388, 430 (1971); *42 Estate of Harry Stoll Leyman,40 T.C. 100, 119 (1963). In applying these factors to the facts of a particular case, no single formula is universally applicable, O'Malley v. Ames,197 F. 2d 256, 258 (8th Cir. 1952), and the ultimate fair market value determination is basically a question of judgment rather than mathematics. Hamm v. Commissioner,325 F. 2d 934, 940 (8th Cir. 1963). As we have noted, in attempting to determine the fair market value of closely-held stock, the value of the company's underlying assets can be an important consideration. In the instant case, the sole dispute between the parties regarding the value of French Tool's and French Oil's underlying assets involves the fair market value of the South Fork Ranch, in which each corporation owned a 50-percent, undivided interest. Thus, we must first find the fair market value of the Ranch before we can proceed to determine the respective values of decedent's shares of French Tool and French Oil stock. In making our fair market value determinations in the instant case, we are guided by *43 section 20.2031-1(b), Estate Tax Regs., which defines "fair market value" as-- the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. * * * Although we are of the opinion that petitioner has carried its burden of proof regarding the correctness of respondent's fair market value determinations, Rule 142, Tax Court Rules of Practice and Procedure, we cannot wholly accept petitioner's valuations of the Ranch and the stock. After examining all of the relevant facts presented in the record before us, we find that, on April 17, 1968, the fair market value of the Ranch was $94 per acre and decedent's shares of French Tool and French Oil stock were worth $300 and $250 per share, respectively. Petitioner contends that the fair market value of the Ranch on April 17, 1968, was $80 per acre and bases its position on an appraisal prepared by R. Floyd Price, Jr. (Price), a real estate appraiser and dealer in the Kerr County area. [7] Respondent, in determining that the Ranch was worth $140 per acre, relies on an appraisal prepared by Joe T. *44 Gilbert (Gilbert), a valuation expert employed by the Internal Revenue Service. Using the so-called comparable sale method of valuation, Price examined 18 different land sale transactions in the Kerr County area. He stated that, in estimating the Ranch's fair market value from these comparable sales, he gave primary consideration to four such sales because of their proximity to the valuation date and because the land involved bore a greater similarity to the Ranch with respect to size, location, and physical characteristics. Gilbert examined nine comparable sales and also took into account his estimation as to the amount the Ranch had appreciated *45 in value between the dates of purchase [8] and the valuation date. He stated that he relied primarily on three of the comparable sales and the appreciated value of the Ranch in making his valuation. Under the facts of the instant case, we think the most accurate estimation of the Ranch's fair market value on April 17, 1968, can be determined by finding, and giving equal weight to, (1) the estimated appreciated value of the Ranch land and (2) the Ranch's approximate value determined by the comparable sale method of valuation. Both such determinations, and especially the former, necessitate our having a fairly accurate estimate of the rate of land appreciation in the Kerr County area. On this point, however, Price and Gilbert were in sharp disagreement. Petitioner's witness, Price, testified that, based on his 20 years of experience as a real estate appraiser and dealer in the Kerr County area, he was of the opinion that land in that area had appreciated at an annual rate of 5 percent from 1963 through 1966 and 15 percent from 1967 until 1974. On the other *46 hand, Gilbert estimated that land in that area had appreciated at an annual rate of 25 percent from 1963 until 1974, and he presented three "land appreciation trend" graphs to support his position. We were more persuaded by Price's personal and professional familiarity with land appreciation rates in the Kerr County area than we were by Gilbert's graphs. In these graphs, Gilbert relied, in large part, on fair market value estimations derived from offers to buy and sell land as well as from the 1969 condemnation award in which a jury found the Ranch to have been worth $150 per acre in November 1968. Our determination of the rate at which land appreciated in the Kerr County area bears quite heavily on our ultimate valuation of the Ranch and, in making this determination, we are extremely reluctant to place much reliance on such inaccurate benchmarks of fair market value as offers to buy and sell and jury condemnation awards. Thus, we found Price's determination as to the Kerr County area land appreciation rate to be the more realistic. The extremely large size of the Ranch (almost three times the size of any comparable sale used by either Price or Gilbert) combined with the unique *47 geographical and climactic conditions in the immediate Kerr County area makes valuation by the comparable sale method in the instant case most difficult. The only sale we found that sheds real light on the Ranch's valuation is the so-called Smith to Ault sale. This is also the only sale that both Price and Gilbert agreed should be given primary consideration in determining the Ranch's value. The Smith to Ault sale involved a 10,526 acre piece of property located in Kerr County adjacent to the eastern boundary of the Ranch. The land was sold for $75 per acre on March 18, 1966, approximately two years prior to the date of decedent's death. The property appears to have been similar to the Ranch as regards location and physical characteristics. After adjusting for the two-year time differential between the date of sale and the valuation date and after allowing for the greater size of the Ranch, we found the Ranch to have been worth $90 per acre when analyzed in terms of the Smith to Ault sale. In determining the Ranch's fair market value, however, we need not rely solely on the comparable sale method of valuation. We note that French purchased 28,165 of the Ranch's 32,914 acres in *48 July 1963 for $70 per acre. He purchased 3,065 acres in January 1965 for $75 per acre and, in March 1966, he purchased the remaining 1,684 acres for $75 per acre. We also note that no significant improvements were made to the land between the dates of these purchases and the valuation date. Using Price's annual land appreciation rate, i.e., 5 percent from 1963 through 1966 and 15 percent from 1967 until 1974, we find that, on April 17, 1968, the average appreciation of these three parcels of land resulted in the Ranch being worth approximately $98 per acre, when viewed strictly from an appreciation standpoint. [9]
Accordingly, after giving equal weight to the approximate values of the Ranch determined from these two methods of valuation, we find that the fair market value of the Ranch on April 17, 1968, was $94 per acre. Having *49 determined the value of the Ranch, we now turn to our primary task of determining the fair market value of decedent's shares of French Tool and French Oil stock. Petitioner's expert witness, Robert E. Moroney (Moroney), in determining the fair market value of decedent's shares of French Tool stock, relied primarily on the capitalization of earnings method of valuation. He estimated that, based on numerous publicly-owned companies with financial prospects similar to French Tool's, decedent's stock, if it had been marketable, would have sold at eight times the company's earnings for the 12-month period ending March 31, 1968, or $432 per share. He then applied a 50-percent discount to this figure to reflect the nonmarketability of the stock, the lack of dividends, and the fact that a purchaser of decedent's interest would have no effective voice in the company's management. Thus, he concluded that, on April 17, 1968, decedent's 1,091 shares of French Tool stock had a fair market value of $216 per share. Respondent's expert witness, George S. Krug, a valuation expert employed by the Internal Revenue Service, gave primary consideration to the value of French Tool's underlying assets *50 in determining that decedent's shares of stock were worth $500 per share. He adjusted the book value of the company's assets upward to reflect respondent's $140 per acre valuation of the Ranch and then applied a 50-percent discount to reflect the stock's lack of marketability and decedent's minority interest. Of the two methods of valuation, we found Moroney's to be the more persuasive. On the date of decedent's death, French Tool was actively engaged in three separate lines of business. Although it owned interests in large amounts of real estate, its land holdings constituted an integral part of its ongoing ranching business. Thus, since French Tool was clearly an operating company actively engaged in selling products and services to the general public, we think that primary consideration should be given to its earnings and prospects for future profits as opposed to the value of its underlying assets. See Levenson's Estate v. Commissioner,282 F. 2d 581, 586 (3d Cir. 1960); Rev. Rul. 59-60, sec. 5(b), 1959-1 C.B. 237. From this perspective, we think that a prospective purchaser of decedent's French Tool stock, in examining the company's *51 financial position on April 17, 1968, would discover a number of factors that would have had a depressing influence on the value of decedent's shares. Such an examination would reveal that, for a number of years, French Tool's ratio of current assets to current liabilities had been about one-to-one. The company's net earnings had fluctuated widely for the past several years and, in fiscal year ending June 30, 1967, the company showed a net loss of approximately $3,000. It had a significant amount of long-term debt that approximately equaled stockholder's equity. The company had never paid any dividends and had not been in a financial position to do so. Finally, the stock was not marketable, and a purchaser of decedent's 43.43-percent interest in French Tool would probably have had little or no voice in the company's management due to the fact that the majority interest was held by decedent's daughter and grandson. However, we think these negative factors would be offset somewhat by the fact that the company's fiscal year ending June 30, 1968, was quite profitable in relation to past years. [10] Also, although the company's net earnings had been quite low for the past several years, *52 its cash flow position (net income plus depreciation) had been much more favorable. Finally, even though the chances on April 17, 1968, were minimal that French Tool would be liquidated in the foreseeable future, we think the rather high adjusted book value of the company's underlying assets would have been an attractive feature to a prospective purchaser of decedent's stock. After taking all of these factors into consideration and after adjusting the value of the underlying assets to reflect the $94 per acre value of the Ranch, [11] we find decedent's 1,091 shares of French Tool stock to have been worth $300 per share on April 17, 1968. *53 Valuations prepared by Moroney and Krug also formed the basis for the parties' respective positions with regard to the fair market value of decedent's 130 shares of French Oil stock. Petitioner contends that such stock was worth $171 per share, while respondent argues that such shares should be valued at $650 per share. Moroney, after noting that French Oil's peculiar financial position negated the more normal methods of valuation, utilized a rather unique approach in making his fair market value determination. He first calculated French Oil's liquidating value at $821 per share. Then, after taking into account the fact that such liquidating value would be of little benefit to a purchaser of decedent's 6.5-percent interest, he attempted to determine how much discount from the liquidating value of $821 per share would be required to compensate a purchaser for the exceptional risks involved. He determined that a fair bargain to both buyer and seller would be reached if the selling price were such as to give a buyer a potential profit of four-to-one (before taxes) on the money he invested. Thus, he valued decedent's shares of French Oil stock at $171 per share since, if a purchaser *54 invested this amount, he would make about a four-to-one profit if the company were later liquidated at $821 per share. In making his valuation of decedent's French Oil stock, Krug again gave primary consideration to the book value of the company's underlying assets. He adjusted such value upward to reflect respondent's $140 per acre valuation of the Ranch and then applied a 50-percent discount because of the stock's nonmarketability and decedent's minority interest. In making our determination that decedent's 130 shares of French Oil stock were worth $250 per share on the date of his death, we did not feel comfortable with either expert's method of valuation. We found Moroney's hypothetical amount that a purchaser would "gamble" in order to obtain a certain return on his investment to be too speculative to warrant our total reliance. With respect to the method utilized by Krug, we think the facts presented clearly show that French Oil, like French Tool, was an operating company on the date of decedent's death. Thus, we think Krug gave excessive consideration to the value of the company's underlying assets in making his valuation. We think that a prospective investor would view *55 French Oil primarily from the standpoint of its history and prospects as a profit-making corporation. An examination of its financial position as of April 17, 1968, reveals that the company was in rather poor shape. Its ratio of current assets to current liabilities had been about one-to-one for a number of years, and its long-term debt was quite high in relation to stockholder's equity. Its ranching business consistently operated at a loss and, although the company showed modest profits for its fiscal years ending August 31, 1965, 1966, and 1967, [12] had it not been for the items of extraordinary income (collection of bad debts and sale of certain oil leases), the company would have lost money in each of these years. Surely a prospective purchaser would have taken into account the fact that, as of April 17, 1968, all of French Oil's bad debts had been collected and would have realized that the company could not continue *56 to sell its oil and gas leases indefinitely. [13]
Moreover, French Oil had never paid any dividends in its 33 years of existence. Decedent's 130 shares were nonmarketable and represented a mere 6.5 percent of the company's issued and outstanding stock. A purchaser of decedent's interest would have had no voice in the company's management since the company was run by French who owned approximately 90 percent of its stock and served as its president and chief executive officer. As we found with French Tool, however, French Oil's cash flow position was more favorable than its net earnings position. Also, notwithstanding the minimal chances that the company would be liquidated, we think a prospective purchaser would place some importance on the rather high adjusted book value of the underlying assets. After taking all of these factors into account, we find that $250 per share would have been a fair price for decedent's 130 shares of French Oil stock. Decision will be entered under Rule *57 155.
Footnotes
1. French Oil also owned 100-percent interest in a 1,280 acre ranch in Dimmit County, Texas, southwest of San Antonio, which it occasionally used for grazing purposes.↩
2. The only sale of either company's stock occurred in 1960 when, as part of a property settlement connected with a divorce, French bought 870 shares of French Oil stock from his former wife for approximately $287 per share.↩
3. The parties have stipulated that the fair market value of Rancho Real was $80 per acre on April 17, 1968. At the date of decedent's death, the South Fork Ranch (Ranch) consisted of approximately 32,914 acres of land located in the southwest corner of Kerr County, Texas, A small portion of the Ranch extends across the western boundary of Kerr County into Real County.
[4]↩ about 75 miles northwest of San Antonio, Texas, and 25 miles west of Kerrville, Texas. 5. French purchased these three parcels of land in his own name but was apparently acting as an agent for French Tool and French Oil, who were undisclosed principals in the transactions.↩
6. Unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954.↩
7. Respondent argues on brief that Price's testimony that the Ranch was worth $80 per acre on April 17, 1968, should have no probative value since, in the 1969 condemnation suit involving the same property, he testified that the Ranch was worth $125 per acre on November 13, 1968. We disagree with respondent and accept Price's explanation at trial that he only had one week to prepare an appraisal for the condemnation suit and was therefore limited as to the number of comparable sales he could analyze for purposes of that litigation.↩
8. Acting as the corporations' agent, French purchased 28,165 acres in 1963, 3,065 acres in 1965, and 1,684 acres in 1966.↩
9. Gilbert testified that, using Price's annual land appreciation rate, the Ranch would be valued at $108 per acre. He apparently made these calculations by using an appreciation rate of 15 percent for 1966 and misunderstood that Price was of the opinion that land in that area had appreciated at an annual rate of 5 percent from 1963 through↩ 1966.
10. Although French Tool's June 30, 1968, financial data would not have been available to a prospective purchaser of decedent's stock on April 17, 1968, the company maintained monthly balance sheets and earnings statements. The financial data for the nine-month period ending March 31, 1968, would have been available and clearly forecasted the profitability of the 1967-1968 fiscal year.↩
11. We cannot accept Moroney's contention that the value of decedent's French Tool stock would not be increased if we found the Ranch to be worth more than $80 per acre. While we think that little weight should be given to the value of the company's underlying assets, to adopt Moroney's position is, in effect, to ignore their value altogether. This we cannot do. See Est. of Lida R. Tompkins,T.C. Memo. 1961-338↩.
12. Unlike French Tool, French Oil did not keep its financial data on a monthly basis. Thus, the financial information for fiscal year ending August 31, 1967, would have been the most recent information available to a prospective purchaser of decedent's stock.↩
13. However, a prospective purchaser would not have known or anticipated on April 17, 1968, that the company's most productive oil lease, Universal 30, would be sold some six weeks later.↩